# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### January 27, 2010 Session

## STATE OF TENNESSEE v. DOUGLAS WAYNE YOUNG

### Direct Appeal from the Criminal Court for Sullivan County
No. S54,721     Robert H. Montgomery, Jr., Judge

---

### No. E2009-00765-CCA-R3-CD - Filed February 14, 2011

---

A Sullivan County Criminal Court Jury convicted the appellant, Douglas Wayne Young, of aggravated rape and sentenced him to twenty-two years in the Tennessee Department of Correction. On appeal, the appellant claims that the trial court erred in (1) admitting the appellant's nine millimeter handgun into evidence; (2) admitting scientific evidence from a DNA and serology expert; (3) finding that there was sufficient evidence to support the conviction; (4) giving the jury an instruction concerning flight; and (5) imposing a sentence of twenty-two years. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and D. KELLY THOMAS, JR., J., joined.

Timothy R. Wilkerson, Kingsport, Tennessee (on appeal), and William A. Kennedy, Blountville, Tennessee (at trial), for the appellant, Douglas Wayne Young.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; H. Greeley Wells, Jr., District Attorney General; and Barry P. Staubus and Teresa Nelson, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I. Factual Background

At trial, the victim testified that on December 1, 2007, she was thirty-nine years old. She and the appellant married in 1998. Although the victim filed for divorce in 2003, the relationship continued sporadically for the next five years. In July 2006, the victim rented

a house which the appellant shared for a short time before he moved into a separate house near the end of August 2007. While the divorce was pending, the victim and the appellant were friendly with each other. The divorce was finalized in May 2008.

The victim testified that the appellant called her around 8:00 a.m. on December 1, 2007. They had previously arranged for the appellant to deliver some landscaping rock to her and bring her some insurance money that day. The appellant called around 9:45 a.m. to ask if the victim wanted him to bring some food, and she said yes.

The victim said that when the appellant arrived with the food at 10:30 a.m., they sat in the kitchen to eat and to discuss the divorce. During the conversation, the appellant told the victim he loved her and did not want to live without her. However, the victim told him the relationship was over. The appellant offered to pay some of the victim's bills, but she declined the offer. The appellant became angry, but the victim calmed him.

The victim testified that shortly thereafter, she and the appellant went to the bathroom to get a bandage for his thumb. While in the bathroom, the appellant asked for a hug, but the victim refused. As she walked away, the appellant grabbed her throat from behind and covered her mouth. The victim screamed, and the appellant shoved her into the doors of a closet containing a washer and a dryer. The victim's face hit the doors, dislodging one of them from its track.

The victim stated that she fell to the floor, and the appellant again placed his hand over her mouth. The victim told the appellant she could not breathe. When he slid his hand down, she bit his thumb. He scraped her mouth with his thumbnail, cutting below her tongue. The appellant ordered her to be quiet and said that "something was going to happen today, [and] he didn't know if either one of [them] was going to survive."

The victim said that, with his thumb still inside her mouth, the appellant pulled her from the floor. He took his thumb from her mouth, faced her, and held her by the throat. He demanded oral sex and took her into a bedroom.

The victim testified that in the bedroom, the appellant pushed her against a wall. When she was on her knees, he stood in front of her, held back his fist, threatened to "punch her," and forced her to fellate him. The victim said she did not willingly fellate the appellant but complied because she was scared. After the appellant ejaculated into the victim's mouth, he told her to stand up, remove her pants, and get on the bed. The victim begged him to stop because her relatives, Helen and Jackie Duty, were coming to the victim's house.

The victim said that upon learning of the impending arrival of her relatives, the appellant stopped. With his hand on the victim's shoulder, the appellant walked her to the kitchen. The victim said she was upset, scared, and bleeding. Although the appellant assured her he would not hurt her anymore, he informed her that he had a loaded nine millimeter handgun in his truck. She did not see the gun that day, but she had previously seen him with it and knew he kept it loaded. The appellant told her that he could take her to the mountains and use the gun to kill them both.

The victim said that she asked for a tissue, and the appellant told her to get a paper towel. She went to get the paper towel and saw Helen and Jackie Duty walking up the back steps. The appellant told her to make them leave. When the victim went to the back door, the appellant followed her and stood five feet from her where he could not be seen. The victim opened the door a little and told Helen to leave because it was not a good time. Because she was scared, she did not tell Helen what was happening.

The victim maintained that after Helen and Jackie Duty left, she got a bag of frozen corn to put on her swelling eye and then got a washcloth from the bathroom. The appellant walked the victim from the bathroom to a bedroom and told her he would rub her feet to calm her. She refused and returned to the kitchen. They continued to talk, and the appellant said he wanted to "work things out."

The victim testified that to get out of the house to possibly seek help, she suggested they unload from the appellant's truck the stone he had brought. The appellant agreed, and they went outside. The victim did not seek help while they were outside because she did not see any neighbors nearby and feared the appellant had a gun in his truck.

The victim said that after they finished unloading the stone, the appellant asked her to sit with him on the tailgate of his truck. She complied, and he asked her not to call the police. The victim said she would not. When the appellant asked how she intended to conceal her injuries, she told him she would use her sick time at work and avoid family members.

The victim recalled that the appellant left approximately three hours after the rape. After he left, the victim immediately locked her doors and called 911. She told the 911 operator that she had been beaten; she did not reveal she had been raped because she was embarrassed and did not want it broadcast over the police radio. She told the operator she did not know if her injuries resulted from the appellant hitting her or shoving her into the closet doors. Although the 911 operator specifically asked if the appellant had threatened to shoot her, she did not disclose the appellant's threats to kill her. She explained that she thought the operator asked if the appellant threatened her if she called police.

The victim said three officers, including one female officer, Danielle Eller, responded to her house. After they arrived, the appellant called. When the victim determined it was the appellant calling, she told the officers. They instructed her to be calm. At the victim's prompting, the appellant disclosed his whereabouts, which the victim relayed to the officers. The victim did not tell the appellant officers were at her house.

The victim said that she revealed to Officer Eller that she had been raped. She explained that she whispered because it was embarrassing. The victim told Officer Eller about the appellant's gun, but she did not tell Officer Eller about the appellant's statement that he did not "know if either one of [them would] survive."

Bristol Police Officer Danielle Eller testified that at approximately 2:45 p.m. on December 1, 2007, she and other officers were dispatched to the victim's house. When they arrived, the victim was frantic, upset, and crying. She had a large knot on her left eye that was beginning to bruise and red marks on her chin and neck. The victim was dabbing her mouth with a washcloth because she was bleeding from several abrasions inside her lip, underneath her tongue, and behind her teeth. Although the victim had rinsed the washcloth and wrung it out, Officer Eller collected the washcloth from her.

Officer Eller testified that the victim said her husband, the appellant, had caused the injuries. During the victim's conversation with Officer Eller, the appellant called. Officer Eller prompted the victim to ascertain the appellant's location. After receiving the information, the victim relayed his location to Officer Eller. Officers were dispatched to the appellant's location.

Officer Eller said that because she was the only female officer on the scene, she and the victim went into the bedroom, away from the male officers. The victim, who appeared embarrassed, whispered the events to Officer Eller. Based on the victim's statements, Officer Eller transported the victim to the hospital for a rape kit to be performed. Officer Eller took another statement from the victim at the hospital, during which the victim told her the appellant owned a nine millimeter handgun.

Officer Eller said that after the victim was released from the hospital, she drove the victim home, collected the victim's clothes, and took photographs of the victim and the house. She also instructed the victim to photograph her wounds over the next several days.

Helen Duty, the victim's cousin, testified that around 11:30 a.m. on December 1, 2007, she and her cousin, Jackie Duty, went to the victim's house. On the way to the front door, Helen noticed the appellant's truck was parked outside. When no one answered the front door, Helen knocked on the back door. The victim, who was crying, answered the door

and asked Helen to leave because it was not a good time. Helen did not see the appellant that morning.

Officer Matthew Harkleroad testified that on December 1, 2007, he and Sergeant Greg Leak went to the appellant's house in Bristol. Officer Harkleroad informed the appellant that he was investigating an alleged rape and asked the appellant if he had a gun. The appellant said he did and directed the officers to an unloaded nine millimeter gun in his bedroom.

Detective Bobby Bedwell testified that on December 1, 2007, he was assigned to locate the appellant. When he did so, he informed the appellant that he was investigating an allegation of rape. The appellant showed Detective Bedwell an apparent bite mark on his right thumb. With the appellant's cooperation, Detective Bedwell collected several pieces of physical evidence, including the appellant's gun and a swab from his mouth. Upon Detective Bedwell's request, the appellant surrendered his pants and underwear. As the appellant undressed, Detective Bedwell noticed a red stain in the groin area of the appellant's underwear. The underwear and swabs from the victim and the appellant were sent to the Tennessee Bureau of Investigation (TBI) for analysis.

Detective Bedwell testified that the appellant did not appear for a January 9, 2008 preliminary hearing in the instant case. Two days later, the appellant was arrested out of state.

Lisa Wessner, a TBI expert in the field of serology and DNA testing, testified that she examined the oral swabs and clothing obtained during the investigation. She found no semen on the victim's oral swab, which could indicate semen was never present. However, she explained the results could also be attributable to the swab being taken three to six hours after the rape and after the victim had rinsed and wiped her mouth.

Agent Wessner said that she found blood, but no semen, on the victim's pants and shirt. She could not determine whose blood was on the pants, but she determined the blood on the shirt was the victim's. She did not find blood on the washcloth. However, she did discover sperm and the DNA of two people, one of whom was female.

Agent Wessner said that on the appellant's underwear, she found sperm but was unable to determine the donor. She also found non-sperm DNA, which belonged to the victim and the appellant. Agent Wessner found the victim's blood on the appellant's jeans. She also found ejaculate stains which contained a mixture of two DNA profiles. Agent Wessner determined the victim was the major contributor, but she could not identify the other contributor.

The appellant testified that he was married to the victim for ten years. During the five years the divorce was pending, the couple reconciled and separated on an almost yearly basis. He said they were cordial with each other and frequently spent time together.

The appellant said that around 8:00 a.m. on December 1, 2007, he called the victim to confirm their prearranged plan for him to deliver landscaping stone to her house that day. He later called again to ask if the victim wanted something to eat. She said yes, and he stopped for food on his way.

The appellant stated that upon arriving at the victim's house, he entered without knocking. He and the victim sat in the kitchen, and while they ate, they talked about finances, a blister on the appellant's thumb, and Helen Duty's expected visit.

The appellant said that when the conversation turned to a woman he was seeing, the victim got upset. The victim got up from the table and walked down the hallway. The appellant said he followed her and grabbed her shoulder. The victim spun around, told him "don't," and fell into the doors enclosing the washer and dryer. When the appellant helped the victim get up, she bit his thumb.

The appellant said he followed the victim into the master bedroom. While the victim smoked a cigarette, they talked about fixing the closet doors. The appellant sat on the bed. The victim finished smoking, made a comment about the other woman the appellant was seeing, and then fellated the appellant.

The appellant asserted that the victim initiated the fellatio and that he did not request or threaten the victim into performing the act. Afterward, he rubbed the victim's back, and she requested a foot rub.

The appellant said that fifteen minutes later, he fixed the closet doors. He went into the kitchen, and the victim told him Helen and Jackie Duty had arrived. While the victim spoke with Helen, the appellant went to the bathroom. When he returned to the kitchen, the visitors were gone.

The appellant stated that the victim was upset and smoked another cigarette. They sat in the kitchen for approximately thirty minutes and then decided to unload the stone. After unloading the stone, they sat on the tailgate of his truck for a few minutes before he left. About thirty minutes later, he called the victim.

The appellant admitted he owned a nine millimeter handgun and had previously kept it in his truck. However, he testified that the gun was in his closet on December 1.

The appellant said he gave Detective Bedwell two separate statements. He gave the first statement around 5:00 p.m. on December 1, during which he did not mention that the victim performed fellatio on him. He also did not mention that the victim had injured her eye or that her mouth was bleeding.

The appellant said he gave his second statement around 10:00 p.m. During the second statement, the appellant said that the victim performed consensual fellatio on him and that he was unsure whether he ejaculated. He did not mention the victim being bruised. He claimed the blood on his underwear could have been from skin tags on his legs or from an "altercation" with the victim.

The appellant acknowledged that between the two statements, the police requested his clothes. As he disrobed, the police saw the blood stain on his underwear.

The appellant said he posted bond after his arrest. As a condition of bond, he was to attend a preliminary hearing, but he did not appear. Instead, he left the state, only returning after he was arrested outside the state.

Based upon the foregoing, the jury found the appellant guilty of aggravated rape.

At sentencing, the trial court found that the appellant was a standard, Range I offender. Finding four enhancement factors and one mitigating factor, the court imposed a sentence of twenty-two years.

On appeal, the appellant claims that the trial court erred in (1) admitting the appellant's nine millimeter handgun into evidence; (2) admitting scientific evidence from a DNA and serology expert; (3) finding that there was sufficient evidence to support the conviction; (4) giving the jury an instruction concerning flight; and (5) imposing a sentence of twenty-two years.

## II. Analysis

### A. Evidentiary Issues

The appellant raises two evidentiary issues. First, he asserts that pursuant to Rule 403 of the Tennessee Rules of Evidence, the State should not have been allowed to introduce the appellant's nine millimeter handgun into evidence. Specifically, he contends that "[i]ntroducing the weapon itself, removing it from its box, and holding it up for the jury to see served no purpose but to engender prejudice." As his second evidentiary issue, the appellant claims the trial court erred in admitting Agent Wessner's testimony regarding DNA

evidence. He asserts that the testimony was unnecessary and that it added "[t]he mystique of [a] scientific expert" to the State's case, which "can have an extremely powerful influence on a jury of lay people even when [the] substance of the testimony does not truly advance a party's position."

At the outset, we note that the appellant has waived these issues by failing to object during the trial. See Tenn. R. App. P. 36(a); see also State v. Alvarado, 961 S.W.2d 136, 153 (Tenn. Crim. App. 1996). Accordingly, we may grant relief only if there is plain error in the record. Tennessee Rule of Appellate Procedure 36(b) provides that "[w]hen necessary to do substantial justice, [this] court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." We may only consider an issue as plain error when all five of the following factors are met:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); see also State v. Smith, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the Adkisson test for determining plain error). Furthermore, the "'"plain error" must be of such a great magnitude that it probably changed the outcome of the trial.'" Adkisson, 899 S.W.2d at 642 (quoting United States v. Kerley, 838 F.2d 932, 937 (7th Cir. 1988)). Upon our examination of the record, we conclude there is no plain error in the record.

### 1. Admission of Gun

Initially, we note that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Tennessee Rule of Evidence 402 provides that "[a]ll relevant evidence is admissible except as [otherwise] provided. . . . Evidence which is not relevant is not admissible." However, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. We will not overturn the trial court's decision regarding the

admissibility of evidence absent an abuse of discretion. See State v. Carruthers, 35 S.W.3d 516, 574 (Tenn. 2000).

As we stated earlier, the appellant asserts that his gun should have been excluded under Rule 403. He contends that there was no dispute he owned the gun and that there was no evidence he used the gun to commit the crime. Therefore, he argues that the gun had no probative value and that admitting the gun was strongly prejudicial because it merely "frighten[ed] or impress[ed] the jury."

At the motion for new trial, the trial court found that admission of the gun was relevant and was important to corroborate the victim's testimony. Notably, the victim testified that she was scared of the appellant, at least in part, because she believed he had a loaded gun in his truck and he said he might shoot her. We agree with the trial court that admitting the gun was probative because it corroborated her testimony. Additionally, as discussed below, the evidence against the appellant was overwhelming. There was substantial support for the victim's version of events, and we do not believe that the introduction of his gun was unfairly prejudicial. Accordingly, the appellant is not entitled to plain error relief on this issue.

## 2. Admission of DNA Evidence

The appellant also claims that Agent Wessner's testimony regarding DNA evidence was "redundant, unnecessarily cumulative, and prejudicial" because the appellant admitted that the victim performed fellatio on him and that he thought he had ejaculated. The appellant argues that the evidence imbued the State's case with "[t]he mystique of [a] scientific expert," making it appear stronger to the jury than it would otherwise. We disagree.

As the trial court noted, the instant case turned, to a large degree, upon the credibility of the witnesses. Although the appellant gave one statement maintaining that the victim performed fellatio on him, he gave another statement in which he did not disclose any sexual activity with the victim. In the absence of DNA evidence, the appellant could have disavowed his claim of consensual sexual contact and alleged there was no sexual involvement between himself and the victim that day. Agent Wessner's testimony that she found the victim's blood on the appellant's jeans and her DNA on his underwear corroborates the victim's testimony that the appellant injured her, causing her to bleed, then forced her to perform fellatio on him. Therefore, the admission of the DNA evidence was relevant because it corroborated the victim's testimony that she performed fellatio on the appellant while her mouth was bleeding and that he ejaculated. Moreover, this evidence was

not unfairly prejudicial. See Tenn. R. Evid. 403. The appellant is not entitled to relief on this claim.

## B. Sufficiency Of The Evidence

Next, the appellant maintains that (1) the trial court erred in not granting a judgment of acquittal at the close of the State's case; (2) the trial court erred by approving the jury's verdict while acting as thirteenth juror; and (3) the evidence is insufficient to support the appellant's conviction. However, all of these challenges essentially concern the sufficiency of the evidence. See State v. Thompson, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000); State v. Burlison, 868 S.W.2d 713, 719 (Tenn. Crim. App. 1993); State v. Ronald Dillman, Jr., No. E2009-00648-CCA-R3-CD, 2010 WL 1854135, at **7-8 (Tenn. Crim. App. at Knoxville, May 7, 2010), perm. to appeal denied, (Tenn. 2010).

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

Aggravated rape is defined, in pertinent part, as the "unlawful sexual penetration of a victim . . . accompanied by . . . [t]he defendant caus[ing] bodily injury to the victim." Tenn. Code Ann. § 39-13-502(a)(2). "Sexual penetration" includes "fellatio." Tenn. Code Ann. § 39-13-501(7).

The proof adduced at trial demonstrates that the appellant shoved the victim into two closet doors with force, bruising her face. While she was on the floor, the appellant silenced the victim by putting his hand over her mouth. She told him she could not breathe and bit his thumb when he moved his hand. When the appellant's thumb was in her mouth, his thumbnail scraped the inside of her mouth and cut underneath her tongue, causing her mouth to bleed. The appellant threatened her, stating that something was going to happen and that he did not know if either of them would survive. With his thumb still in her mouth, the

-10-

appellant lifted the victim off the ground by her jaw. He then grabbed her throat and took her into a bedroom where he pushed her against a wall and onto her knees. The appellant raised his fist and threatened to strike the victim if she bit him. He then forced her to perform fellatio on him. Therefore, we conclude that the evidence was sufficient to sustain the appellant's conviction for aggravated rape.

The appellant also contends that the State's evidence was insufficient because the victim's testimony was too inconsistent to support a conviction. Specifically, he asserts that the victim gave inconsistent statements regarding how she sustained injuries. He also contends that the victim's failure to advise the 911 operator that she had been raped renders her testimony incredible.

The record reflects that defense counsel emphasized the inconsistencies in the victim's testimony on cross-examination. However, these purported inconsistencies do not render the victim's testimony incredible as a matter of law. We will not overturn a jury's verdict "unless there are inaccuracies or inconsistencies that 'are so improbable or unsatisfactory as to create a reasonable doubt of the [appellant's] guilt.'" State v. Elkins, 102 S.W.3d 578, 582-83 (Tenn. 2003). We note that the victim's testimony was bolstered by physical evidence, such as the injuries the victim sustained and the presence of the victim's blood and ejaculate on the appellant's underwear. Further, the victim explained that she did not report the rape to the 911 operator because she was embarrassed and feared it would be broadcast over police scanners for all to hear. The jury, as the finder of fact, obviously accredited the testimony of the victim. See Morris, 24 S.W.3d at 795. This issue is without merit.

## C. Flight Instruction

The appellant contends that the trial court erred in instructing the jury that it could infer "a consciousness of guilt" if it found that the appellant fled. The appellant maintains the evidence showing he did not appear at the preliminary hearing and was subsequently arrested in Georgia is insufficient to support a flight instruction.

At the beginning of the trial, the parties informed the court that, although there would not be a stipulation, they had agreed as to the testimony the appellant would give concerning his failure to appear at the preliminary hearing. When the appellant testified, he said that he made bond after he was arrested but that he did not appear at the preliminary hearing. Instead, he left the state, only to return after he was arrested by authorities out of state. At that point, the court held a bench conference and asked counsel if the court "need[ed] to make any additional instructions contemporaneous with [the appellant's] admission to . . . going out of state." Later, the court said that because "flight is also an inference, and there's going to be an instruction on flight, [the court did not] want to confuse the jury with any

additional instructions." Defense counsel responded that he "would rather not have that." Finally, the court in fact charged the jury on flight:

> The flight of a person accused of a crime is a circumstance which, when considered with all the facts of the case, may justify an inference of guilt. Flight is the voluntary withdrawal of oneself for the purpose of evading arrest or prosecution for the crime charged. Whether the evidence presented proves beyond a reasonable doubt that the [appellant] fled is a question for your determination.

> The law makes no precise distinction as to the manner or method of flight; it may be open, or it may be a hurried or concealed departure, or it may be a concealment within the jurisdiction. However, it takes both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or leaving of the community for parts unknown, to constitute flight.

> If flight is proved, the fact of flight alone does not allow you to find that the defendant is guilty of the crime alleged. However, since flight by a defendant may be caused by a consciousness of guilt, you may consider the fact of flight, if flight is so proven, together with all of the other evidence when you decide the guilt or innocence of the [appellant]. On the other hand, an entirely innocent person may take flight and such flight may be explained by proof offered, or by the facts and circumstances of the case.

> Whether there was flight by the [appellant], the reasons for it, and the weight to be given to it, are questions for you to determine.

It is well-established that a defendant has a "constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). A trial court can instruct the jury about inferring guilt from flight if there is evidence of "both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown." State v. Burns, 979 S.W.2d 276, 289-90 (Tenn. 1998) (internal quotations and emphasis omitted); see also State v. Berry, 141 S.W.3d 549, 588 (Tenn. 2004). "The State can satisfy the subsequent hiding out,

evasion, or concealment requirement by introducing evidence from which a jury might infer such action." State v. Shawn Simmons, No. M2009-01362-CCA-R3-CD, 2010 WL 3719167, at *4 (Tenn. Crim. App. at Nashville, Sept. 23, 2010), application for perm. to appeal filed, (Nov. 8, 2010).

In the instant case, there was sufficient evidence to support the instruction. The appellant testified that he did not appear at his preliminary hearing, that he left the state, that he was arrested by authorities outside of the state, and that he did not return to the state until after his arrest. These facts provide the basis from which a jury could infer that the appellant fled to parts unknown in order to avoid prosecution. Therefore, we conclude the trial court did not err in instructing the jury.

### D. Sentencing

The appellant's remaining issues concern his sentence. He contends that the trial court erred in both applying certain enhancement factors and in balancing the enhancing and mitigating factors.

Appellate review of the length, range or manner of service of a sentence is de novo. See Tenn. Code Ann. § 40-35-401(d). In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on the appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts. If the record reveals that the trial court adequately considered sentencing principles and all relevant facts and circumstances, this court will accord the trial court's determinations a presumption of correctness. Id. at (d); Ashby, 823 S.W.2d at 169.

The trial court applied four enhancement factors under Tennessee Code Annotated section 40-35-114: (1) that the appellant "has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range"; (6) that "[t]he personal injuries inflicted upon . . . the victim w[ere] particularly great"; (7) that "[t]he offense involved a victim and was committed to gratify the [appellant's] desire for pleasure or excitement"; and (14) that the appellant "abused a position of . . . private trust. On appeal,

-13-

the appellant challenges the application of factors (1), (6), and (14) but does not challenge the application of enhancement factor (7).

The trial court relied upon the appellant's failure to appear at the preliminary hearing as the basis for applying enhancement factor (1). The trial court stated that the appellant's failure to appear was a violation of his bond and a crime. Thus, the court found that although the appellant had not been convicted of a crime, his actions constituted "criminal behavior." We agree the proof was sufficient to justify the application of this enhancement factor. See State v. Jonathan D. Rosenbalm, No. E2002-00324-CCA-R3-CD, 2002 WL 31746708, at *8 (Tenn. Crim. App. at Knoxville, Dec. 9, 2002).

The appellant argues that enhancement factor (6) is inapplicable to a conviction for aggravated rape because "bodily injury" is an element of the offense. He also asserts the evidence was insufficient to justify the enhancement. However, the trial court did not apply enhancement factor (6) because of the physical injuries sustained by the victim. Instead, the court concluded her emotional and psychological injuries justified the enhancement.

Our supreme court has stated "that enhancement factor (6) contemplates psychological or emotional injuries, as well as physical injuries, provided that the evidence establishes that such injuries are 'particularly great.'" State v. Arnett, 49 S.W.3d 250, 260 (Tenn. 2001). The court further explained:

> While we recognize that all victims of crime, certainly victims of rape, must surely experience mental trauma, we are aware that no two crimes are exactly the same, and no two victims react to this crime in the same manner. Because some victims may suffer even more severe emotional trauma than is normally involved with this offense, our legislature has seen fit to enhance the punishment for those defendants causing "particularly great" psychological injury.

Id. Therefore, to support the application of this enhancement factor in aggravated rape cases, there must be "specific and objective evidence demonstrating how the victim's mental injury is more serious or more severe than that which normally results from this offense. Such proof may be presented by the victim's own testimony, as well as the testimony of witnesses acquainted with the victim." Id.

The record contains sufficient evidence to support the application of enhancement factor (6). Although the victim did not testify at the sentencing hearing, the trial court relied upon her trial testimony and the evidence in the presentence report to support the

-14-

enhancement. In the victim impact statement, the victim stated that the crime significantly impacted her ability to trust others; caused frequent, terrorizing nightmares; and caused her to be fearful and self-consciousness when in public. The victim found it necessary to alter her daily activities because she is afraid to come home after dark or to walk her dogs at night. She said that because of her fear of being attacked, she left on all the lights in her house. She also stated that after the attack, she required family members to stay with her every night. The statement, which was made months later, demonstrates that the crime's effects were prolonged. As in Arnett, the description of the victim's trauma in the presentence report is "more than a general recount of her fears." Id. at 261. We conclude that there was a sufficient basis for the trial court to apply the enhancement factor in this case. See id. at 260-61; see also State v. Williams, 920 S.W.2d 247, 259-60 (Tenn. Crim. App. 1995).

The trial court likewise did not err in applying enhancement factor (14) regarding the appellant's abuse of private trust. The appellant contends that the factor is inapplicable because there was no evidence establishing the victim's particular vulnerability. He asserts that proof of the victim's marriage to the appellant, without more, was not enough to trigger the enhancement. This court has previously stated that the fact of a marriage alone is insufficient to warrant the application of enhancement factor (14) because a marital relationship does not necessarily engender trust between adults. State v. Paul Graham, No. M2003-00331-CCA-R3-CD, 2004 WL 741666 (Tenn. Crim. App. at Nashville, Apr. 7, 2004). Instead, "the court must look to 'the nature of the relationship,' and whether the relationship 'promoted confidence, reliability, or faith.'" State v. Gutierrez, 5 S.W.3d 641, 646 (Tenn. 1999) (quoting State v. Kissinger, 922 S.W.2d 482, 488 (Tenn. 1996)). Such relationships "usually include[] a degree of vulnerability," and "[i]t is the exploitation of [that] vulnerability to achieve criminal purposes which is deemed more blameworthy and thus justifies application of the enhancement factor." Id. Consequently, our supreme court has held that the abuse of trust enhancement factor applies "where there is evidence that the nature of the relationship between the perpetrator and the . . . victim caused the victim to be particularly vulnerable." Id.

The record reveals that the appellant and the victim were married at the time of the crime. They were living in separate houses and had long been planning a divorce, but they maintained an amicable and even social relationship. The instant crime was facilitated by the fact that the victim welcomed the appellant into her home and that the two were alone there. Indeed, the evidence indicates that the appellant walked into the house without knocking, and it appears the victim thought nothing of it. Thus, the evidence is clear that the victim's relationship with the appellant was one in which she felt comfortable enough to allow him into her home and lower her guard. The victim further allowed herself to be especially close to him while she was placing a bandage on his thumb. In short, the evidence

shows that the victim's relationship caused her to be particularly vulnerable to his attack. We conclude that the trial court did not err in applying enhancement factor (14).

The appellant does not contend that the trial court failed to apply an applicable mitigating factor. Rather, he contends that the trial court did not properly balance the enhancing and mitigating factors. However, "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." State v. Carter, 254 S.W.3d 335, 345 (Tenn. 2008). In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343 (quoting Tenn. Code Ann. § 40-35-210(d)). "[A]ppellate courts are therefore left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence . . . [and are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346. Because the trial court's imposition of sentence is consistent with the purposes and principles of the Sentencing Act, the sentence is presumptively correct, and we cannot reweigh the enhancing and mitigating factors. See Carter, 254 S.W.3d at 344-45. Therefore, we affirm the appellant's sentence.

### III.  Conclusion

In sum, upon concluding that the trial court made no evidentiary errors, that there was sufficient evidence to support the appellant's conviction, that the flight instruction was appropriate, and that the trial court did not err in imposing a twenty-two-year sentence, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE